**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL MCCOMB, as Parent and Special Administrator of the Estate of GISELLE MCCOMB, deceased,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| v. | ) ) | No. 11 C 0256 |
| **JOSE L. BUGARIN, BUGARIN TRUCKING, INC., J.L. SHANDY TRANSPORTATION, INC., J.L. SHANDY-SHAMROCK DIVISION, INC., J.L. CROTTY, LLC, CENTRAL STEEL AND WIRE COMPANY, INC., and STATE FARM MUTUAL AUTOMOBILE INSURANCE CO.,** | ) ) ) ) ) ) ) ) | Judge Rebecca R. Pallmeyer |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

On December 28, 2010, Giselle McComb was killed when the car she was driving was struck by a semi-tractor trailer driven by Defendant Jose Bugarin. Giselle's father, Plaintiff Michael McComb ("McComb"), brought this suit as the special administrator of his daughter's estate asserting claims for wrongful death against several defendants. In addition to Bugarin, Plaintiff has named J.L. Shandy Transportation ("Shandy") (the trucking company under whose authority Bugarin operated), and Central Steel and Wire Company ("Central Steel") (the manufacturer whose steel Bugarin was hauling at the time of the accident). Specific to Central Steel, McComb alleges that the Chicago-based company is liable for the death of Ms. McComb based on its negligent selection of its contractors, Shandy and Bugarin. Central Steel now moves for summary judgment, arguing that (1) it did not violate any duty to McComb, and (2) McComb failed to show that the accident was proximately caused by any negligence on Defendant's part. For the reasons explained below, Central Steel's motion for summary judgment [108] is granted.

**BACKGROUND**

I.  **The Collision**

On the evening of December 28, 2010, trucker Jose Bugarin, operating under the authority of J.L. Shandy Transportation, left Central Steel's Portage, Indiana facility. Bugarin's semi-tractor trailer was loaded with 46,480 pounds of steel plate destined for another Central Steel facility in Milwaukee. (Pl.'s Statement of Material Facts [112], hereinafter "Pl.'s 56.1", ¶¶ 1, 2; Def.'s 56.1 ¶ 4.)[1] En route to Milwaukee, Bugarin drove northbound on U.S. Route 41 through Lake County, Illinois, a stretch of roadway that the driver described as "unfamiliar." (*Id.* ¶ 21.) Due to this lack of familiarity, Bugarin was unaware that, at approximately 7:21 p.m., he was approaching a major intersection at the junction of Route 41 and Illinois State Route 173. (*Id.*) The intersection was not readily apparent to the driver due to a power outage that had darkened the intersection's street lights, stop lights, and the lights of nearby businesses; as a result, the headlights of passing cars provided the only sources of light in the area. (*Id.* ¶ 20.) In fact, Bugarin testified in his deposition that he believed he had already passed the intersection of U.S. 41 and Illinois 173 until, just before impact, he saw the westbound car driven by Ms. McComb directly in front of his truck. (*Id.* ¶ 14.) Only then did Bugarin apply his brakes (Def.'s 56.1 ¶ 16), but, at that point, he was too late. Bugarin's semi-tractor trailer collided with Ms. McComb's vehicle on its driver's side, killing her. (4th Am. Compl. ¶ 13.)

---

[1] Plaintiff failed to comply with Local Rule 56.1. Rather than, as is required, affirming or denying each paragraph of Central Steel's statement, McComb simply offered his own version of events without reference to Defendant's. N.D. Ill. L.R.56.1(b) ("Each party opposing a motion filed pursuant Fed. R. Civ. P. 56 shall serve . . . a concise response to the movant's statement that shall contain . . . a response to each numbered paragraph in the moving party's statement[.]"). As a result, the court's factual background will cite to both parties' statements where appropriate. Where the court was able to identify a disagreement between the parties' facts, it refers to both.

## II. The Post-Accident Investigation

Following the wreck, Deputy Sheriff John Vinson ("Deputy Vinson"), an accident investigator with the Lake County Sheriff's Office, was dispatched to the scene to determine the cause of the accident. (Def.'s 56.1 ¶ 17.) In preparing his report, Deputy Vinson performed various roadway measurements, took photographs of the scene, and interviewed Bugarin and witnesses of the crash. (*Id.* ¶ 18.) Based on the length of the skid marks leading to the point of impact, Vinson concluded that Bugarin had been traveling at or near the posted speed limit of 50 miles per hour at the time of the accident. (*Id.* ¶ 22.) The following day, Deputy Vinson requested that Illinois State Trooper James Kirkpatrick ("Trooper Kirkpatrick") perform an investigation of Bugarin's truck. (*Id.* ¶ 23.) Trooper Kirkpatrick performed both visual and diagnostic assessments of the vehicle at a nearby tow yard, evaluating the truck's tires, wheels, brakes, lights, horn, windshield wipers, and cab. (*Id.* ¶¶ 25–26.) Kirkpatrick's investigation uncovered several violations of the Federal Motor Safety Carrier Regulations ("FMSCRs"): all four trailer brakes were out of adjustment, a brake chamber on the right side of the first drive axle was loose, a shock absorber was missing, and the brakes' required automatic slack adjusters had been replaced by manual adjusters. (Pl.'s 56.1 ¶¶ 13, 18.) Kirkpatrick also cited Bugarin for failing to perform a proper pre-trip inspection. (*Id.* ¶ 14.) Each of these violations existed prior to the collision, Kirkpatrick concluded, and had the driver conducted a proper pre-trip inspection, "it would have been incumbent upon [Bugarin] to cause [the violations] to be repaired prior to driving." (*Id.* ¶¶ 15–17; Kirkpatrick Dep., Ex. G to Def.'s Mot., at 43:3–14.) Shandy acknowledges that a competent driver should be able to recognize the identified violations in a pre-trip inspection, and Bugarin further admits that, had he known of the brake violations on his truck, he would have adjusted them before operating the vehicle. (Pl.'s 56.1 ¶¶ 19–21.) Neither party provides information concerning how much time these adjustments might have taken, nor do they suggest how long such repairs would have kept Bugarin's truck out of service.

3

Deputy Vinson's report, which he based on his own data as well as the findings of Trooper Kirkpatrick's investigation, concluded that the only "major contributing cause" of the accident was the lack of traffic lights at the intersection of U.S. Route 41 and Illinois State Route 173 (Def.'s ¶ 34); Kirkpatrick did identify "improperly adjusted brakes" as a "minor contributing cause" of the wreck, as well. (Kirkpatrick Dep., Ex. G to Def.'s Mot, at 51:6–15.) Nonetheless, neither Trooper Kirkpatrick nor Deputy Vinson had any opinion as to whether the identified violations had any impact on the accident that killed Ms. McComb. Specifically, Kirkpatrick testified that he did not know whether either the loose brake chamber or the out-of-adjustment trailer brakes affected the stopping ability of the Bugarin truck; and Vinson could not offer an opinion as to whether these brake issues impacted Bugarin's ability to stop or whether any of the violations discovered on the truck had played a causal role in the accident. (Def.'s 56.1 ¶¶ 31–32, 35–36.) Bugarin, for his part, testified that he did not notice anything wrong with his truck's brakes while driving that night. (*Id.* ¶ 13.) Vinson's report also concluded that neither weather, road conditions, Bugarin's speed, nor McComb's car played any role in causing the collision.

### III. Central Steel's Selection of Shandy & Bugarin

Shandy is one of several common carriers used by Central Steel to haul loads between its various locations in the Midwest, including the facilities in Portage, Indiana and Milwaukee, Wisconsin. (*Id.* ¶ 10.) Over the course of a 20-year business relationship, Shandy's drivers have hauled between 12,000 and 20,000 loads for Central Steel. (*Id.* ¶ 9.) Each of Shandy's drivers, including Bugarin, operate as independent contractors, working pursuant to full-time leases under Shandy's motor carrier operating authority (USDOT #235110). (*Id.* ¶ 6.) Central Steel's process for evaluating the competency of its potential carriers includes the investigation of their insurance coverage, their current operating authority status, and their Federal Motor Carrier Safety Administration ("FMCSA") safety rating. (*Id.* ¶ 11.) Specifically, Central Steel requires all of its carriers to maintain the highest FMCSA rating: "satisfactory." (*Id.* ¶ 12.) As of

4

December 28, 2010, Shandy carried a "satisfactory" FMCSA rating (although that rating was, at that point, ten years old[2]), and it was authorized by that organization to operate on the nation's roadways. (*Id.* ¶ 7–8; Pl.'s 56.1 ¶ 9.)

Through the end of 2010, the FMCSA also maintained a separate safety assessment program known as "SafeStat."[3] Developed in 1997, SafeStat provided real-time motor carrier safety data via the FMSCA website. (Pl.'s 56.1 ¶¶ 4–5.) SafeStat ratings were percentile-based safety measures for carriers relative to their peers across various Safety Evaluation Areas ("SEAs"), such as driver fitness, crash data, and vehicle maintenance. (FMCSA Web site, Ex. 19 to Def.'s Resp.) Overall SafeStat Scores were assigned only to carriers who were deficient (defined as falling within the bottom quartile) in at least two SEAs. (*Id.*) Given that SEA values reflected carriers' performance relative to their peers, the FMCSA posted the following warning on its website:

> Because of State data variations, FMCSA cautions those who seek to use the SafeStat data analysis system in ways not intended by the FMCSA. Please be aware that use of the SafeStat for purposes other than identifying and prioritizing carriers for FMCSA and state safety improvement and enforcement programs may produce unintended results and not be suitable for certain uses.

(Def.'s Mot. at 17.) Nonetheless, Plaintiff highlights that, from February 28, 2008 to December 28, 2010, Shandy's vehicle maintenance SEA value was "consistently deficient," and its rating was 81.23[4] on December 17, 2010. (Pl.'s 56.1 ¶ 7.) Neither party has submitted information concerning Shandy's other SEA values. Central Steel checked carriers' FMCSA rankings, but admits it did not check their SafeStat scores; Defendant also points out, however, that FMCSA

---

[2] The parties do not explain whether the age of that rating is significant.

[3] SafeStat was replaced by a new program known as "Compliance, Safety, Accountability" or "CSA" at the end of 2010. (Def.'s Mot. at 16n.1.)

[4] An SEA value of 1 indicated the top-rated carrier for that evaluation area, while an SEA of 100 would indicate the worst-rated carrier. Thus, Shandy's 81.23 rating reflected that 81.23% of carriers had higher scores for vehicle maintenance at that time.

5

ratings are "the exclusive means used by the U.S. Secretary of Transportation in determining whether a motor carrier is qualified (from a safety perspective) to operate in interstate commerce." (Def.'s 56.1 ¶¶ 10–11; Def.'s Mot. at 16 (citing 49 C.F.R. § 385.13).)

## IV. This Lawsuit

McComb filed the instant suit against several defendants, including Shandy, Bugarin, and Central Steel, on January 13, 2011 [1]. Plaintiff's third amended complaint [63] included two counts against Central Steel: Count V alleged liability for negligent selection, while Count VI sought punitive damages for the conduct of Count V. Central Steel moved to dismiss both counts [71], later withdrawing its motion with regards to Count V. The court granted Central Steel's motion and dismissed Count VI [80], because Illinois law does not allow for decedents' next of kin to recover punitive damages. Plaintiff subsequently filed his fourth amended complaint [83], seeking damages from Central Steel for wrongful death based on liability stemming from the alleged wrongful selection of Shandy and Bugarin as Defendant's independent contractors.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "To determine whether genuine issues of material fact exist, we ask if 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). In determining the existence of material facts, the court must examine the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011).

## II. Negligent Selection

Plaintiff has sued Central Steel for damages under the Illinois Wrongful Death Act due to injuries caused by Shandy and Bugarin, Defendant's shipping contractors. Generally speaking, a principal is not liable for the acts of its independent contractors. *Horwitz v. Holabird & Root*, 212 Ill. 2d 1, 9, 816 N.E.2d 272, 276 (Ill. 2004) (citing *Gomien v. Wear-Ever Aluminum, Inc.*, 50 Ill. 2d 19, 21, 276 N.E.2d 336, 338 (Ill. 1971)). Under Illinois law—which follows § 411 of the RESTATEMENT (SECOND) OF TORTS—a principal may be held liable under a theory of negligent selection for injuries caused by its independent contractor where the principal was negligent in hiring the contractor in the first place. *See* RESTATEMENT (SECOND) OF TORTS § 411; *see also Gomien*, 50 Ill. 2d at 22–23, 276 N.E.2d at 338 (relying on § 411); *Alvis v. City of Du Quoin*, No. 5-09-0543, 2011 WL 10500871, at *6 (Ill. App. Ct. 5th Dist. Feb. 16, 2011) ("The negligent hiring of a contractor in Illinois is governed by section 411 of the RESTATEMENT (SECOND) OF TORTS[.]"). "An action for negligent hiring or retention of an employee requires the plaintiff to plead and prove (1) that the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of the employee's hiring or retention; and (3) that this particular unfitness proximately caused the plaintiff's injury." *Doe v. BSA*, No. 2-13-0121, 2014 WL 274426, *8 (Ill. App. Ct. 2d Dist. Jan. 24, 2014) (quoting *Van Horne v. Muller*, 185 Ill 2d 299, 310, 705 N.E.2d 898, 904 (Ill. 1998)); *see also* RESTATEMENT (SECOND) OF TORTS § 411 cmt. b ("The employer of a negligently selected contractor is subject to liability . . . for physical harm caused by his failure to exercise reasonable care to select a competent and careful contractor, but only for such physical harm as is so caused. In order that the employer may be subject to liability it is, therefore, necessary that harm shall result from some quality in the contractor which made it negligent for the employer to entrust the work to him.").

Here, Plaintiff claims that Central Steel knew or should have known that Shandy and Bugarin were "incompetent, unsafe, and unfit to haul Central Steel's loads" due to the fact that they "had been assigned a deficient safety rating by the FMCSA for vehicle maintenance." (4th Am. Compl., Count V, ¶ 22; Pl.'s Resp. at 22–24.) McComb further alleges that Defendant's failure to "sufficiently inquire" into Shandy's and Bugarin's competence as carriers was the proximate cause of his daughter's death and, therefore, Central Steel is liable to McComb for damages under the Illinois Wrongful Death Act. (4th Am. Compl., Count V, ¶¶ 24, 31 (citing 740 ILCS § 180/1).) Under Illinois law, assuming Plaintiff establishes Shandy's and Bugarin's incompetence, Central Steel would be liable for any injuries proximately caused by its contractors' poor vehicle maintenance. The court will address the third element of Plaintiff's claim (i.e., proximate cause) first, as it is dispositive.

The term "proximate cause" encompasses two distinct requirements: cause in fact and legal cause. *Young v. Bryco Arms*, 213 Ill. 2d 433, 446, 821 N.E.2d 1078, 1085 (Ill. 2004) (citing *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455, 605 N.E.2d 493, (Ill. 1992)). The first requirement, cause in fact, is present "when there is a reasonable certainty that a defendant's acts caused the injury or damage." *Id.* In deciding this question, the court asks whether the injury would have occurred absent the defendant's conduct. The second requirement, legal cause, is established only if the defendant's conduct is "so closely tied to the plaintiff's injury that he should be held legally responsible for it." *Simmons v. Garces*, 198 Ill. 2d 541, 558, 763 N.E.2d 720, 732 (2002) (quoting *McCraw v. Cegielski*, 287 Ill. App. 3d 871, 873, 680 N.E.2d 394, 396 (1996)). This is a question of policy: "how far should a defendant's legal responsibility extend for conduct that did, in fact, cause the harm?" *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 395, 821 N.E.2d 1099, 1127 (Ill. 2004) (citing *Simmons*, 198 Ill. 2d at 558, 763 N.E. 2d at 732). Although proximate cause is generally a question of fact, where the facts alleged do not sufficiently demonstrate both cause in fact and legal cause, the lack

of proximate cause may be determined by the court as a matter of law. *Beretta*, 213 Ill. 2d at 395–96, 821 N.E.2d at 1127–28 (citing *Simmons*, 198 Ill. 2d at 558, 763 N.E.2d at 732).

As Central Steel points out, Plaintiff has failed to offer any evidence that Defendant's contractors' particular incompetence (i.e., poor vehicle maintenance) was actually to blame for McComb's damages. (Def.'s Reply at 24.) In fact, McComb actively disavows that a brake failure caused the accident, clarifying that he "has not alleged that the *application* of deficient brakes is the cause of this collision." (Pl.'s Resp. at 27 (emphasis in original).)[5] Relying instead on a misunderstanding of Illinois's law of negligent selection, Plaintiff argues that, because "the tractor and trailer involved in the collision should not have been on the road in the first place due to its vehicle deficiencies" (Pl.'s Sur-Reply at 13), McComb "only needs to show that there is a question as to whether Central Steel knew, or in the exercise of reasonable care should have known, that Shandy and Bugarin was an incompetent, unsafe, or unfit motor carrier" based on their poor vehicle maintenance scores. (Pl.'s Resp. at 26.)

In support of the argument that Defendant's "*selecting* an incompetent and unfit motor carrier . . . was the direct and proximate cause of Giselle's tragic death" (Pl.'s Resp. at 27 (emphasis in original)), Plaintiff cites three cases that, like this one, involved negligent selection claims by victims of car accidents caused by independent contractors driving tractor-trailers. None of the cases Plaintiff cites were decided under Illinois law. Further, in all three, the damages caused by the incompetent contractors were related to the characteristic that rendered him incompetent to begin with. *See L. B. Foster Co. v. Hurnblad*, 418 F.2d 727, 727–28, 730 (9th Cir. 1969) (affirming jury verdict for plaintiff who alleged liability for negligent selection where contractor had a history of using unsafe equipment and the accident was caused by a

---

[5] There is a shred of evidence that Bugarin's loose brake chamber at least contributed to the collision. (*See* Kirkpatrick Dep., Ex. G to Def.'s Mot, at 51:6–15 ("Q: Okay. And what did you determine could be a contributory cause [of the December 28, 2010 accident]? . . A: Improperly adjusted brakes.").) Plaintiff has not made this argument, however, and in fact has disavowed it.

brake failure); *Hudgens v. Cook Ind., Inc.*, 521 P.2d 813, 814–15 (Okla. 1974) (reversing summary judgment for defendant where plaintiff alleged that defendant had negligently selected a trucking company that used "defective and unsafe equipment" and the investigating officer testified that the accident was caused, in part, by slick, threadbare tires on both the trailer and the driving axle); *Chinn v. Mark Transp., Inc.*, L-829-06, 2010 WL 374958 (N.J. Super. A.D. Feb. 4, 2010) ("We recognize that [the defendant] could be liable only if [the independent contractor]'s disqualification was the cause of the harm to plaintiffs.") (citing RESTATEMENT (SECOND) OF TORTS § 411 cmt. b). These cases offer no support for Plaintiff here, where the condition of the truck did not cause the accident.

The deposition testimony McComb cites does not alter this conclusion. First, Plaintiff offers the testimony of Dr. Thomas M. Corsi, an expert in liability and transportation, who suggests that Defendant never should have hired the contractors because of their low SafeStat scores for poor vehicle maintenance. Corsi went on to testify that if Bugarin had never been hired by Central Steel, he would not have been hauling Defendant's goods on December 28, 2010, and, therefore, he could not have collided with Ms. McComb's vehicle. (Pl.'s Sur-Reply [120] at 12–13.)[6] Second, McComb argues that Shandy's and Bugarin's poor vehicle

---

[6] Plaintiff argues that the testimony of Dr. Thomas M. Corsi provides the necessary evidence that "Shandy/Bugarin's SafeStat percentile score for vehicle maintenance was the proximate case of his injury." (Pl.'s Sur-Reply at 12.) Specifically, Plaintiff quotes the following portion of Dr. Corsi's deposition testimony:

> Q: It's your opinion because Shandy had a high vehicle maintenance score in December of 2010 that nobody should have hired Shandy, right?
>
> A: Yes.
>
> . . .
>
> Q: It's your opinion that this accident would not have occurred if Central Steel didn't hire Shandy, right?
>
> A: Yes.

(continued . . .)

maintenance prevented them from identifying problems with Bugarin's truck that, if spotted, would have kept it off the road that night. (Pl.'s Reply at 26–28.) As Plaintiff points out, even Bugarin admits that he would not have driven his truck if he had known that a brake chamber required maintenance. (Bugarin Dep., Ex. C to Def.'s Mot., at 129:5–8.)

Both of these theories are insufficient to establish causation, however, as they require an extension of Defendant's liability far beyond the reach of its actual culpability. In the first theory, Plaintiff focuses on the error in Defendant's decision to hire allegedly incompetent contractors, while ignoring the issue of what, if any, role their particular unfitness played in the accident that killed Ms. McComb. McComb relies on Dr. Corsi's testimony to establish that Central Steel should not have hired Shandy and Bugarin and that these contractors' vehicle struck and killed Plaintiff's daughter. Although this establishes a connection between Bugarin's hiring and Ms. McComb's death, that connection does not constitute a legal cause. There is, of course, a literal sense in which anything that happens that would not have happened "but for" a prior event is causally connected to that event. *Cf. Gavin v. AT&T Corp.*, 464 F.3d 634, 639 (7th Cir. 2006) (observing that parties to a securities fraud would not have existed, absent the Big Bang). But to prove a negligent selection claim, there must be a showing that the contractor's particular incompetence caused the accident. Plaintiff has not made such a showing here. Instead, he appears to conflate the broad liability that attaches vicariously to employers for their employees'

---

. . .

Q: Doctor, do you feel that a shipper such as Central Steel, if it had done its homework and checked these scores, wouldn't hire a company like Shandy?

A: Yes.

(Corsi Dep., Ex. B to Def.'s Reply, at 77:23–81:23.)

actions (i.e., *respondeat superior*) with the narrower direct liability that principals face for negligently selecting independent contractors.[7]

McComb's second narrative of causation similarly argues for liability that is overbroad. Under this theory, Central Steel's selection of its contractors was the proximate cause of this deadly accident if Bugarin's truck suffered from *any* defect that should have kept it off the road that night, regardless of the defect's contribution to the wreck. For instance, based on McComb's logic, even if Bugarin's truck had been in perfect working condition on December 28, 2010 except for a burned out taillight or a loud muffler—either of which would have made the vehicle unlawful to drive in Illinois[8]—Central Steel's selection of its contractors was the proximate cause of Ms. McComb's death. But even assuming that Defendant's conduct was not too remote to establish it as the legal cause of Plaintiff's injury, Plaintiff has failed to show that Central Steel's selection of its contractors was even a "but for" cause of Ms. McComb's death. As noted above, Plaintiff explicitly denies that any mechanical issue with the brakes caused the collision (Pl.'s Resp. at 27), a denial that is supported by Deputy Vinson's conclusion that the lack of traffic lights were the only "major contributing cause" of the accident. (Def.'s ¶ 34.) Thus, the only way in which McComb claims that the contractors' poor maintenance work

---

[7] For example, under Plaintiff's interpretation of negligent selection, wherever a principal hires a contractor that, for any reason, is incompetent for the task at hand, the principal would be liable for *any* harm the contractor causes in the principal's service, regardless of the incompetence's connection to the harm. This is clearly inconsistent with Illinois law. *See* RESTATEMENT (SECOND) OF TORTS § 411 cmt. b ("In order that the employer may be subject to liability it is, therefore, necessary that harm shall result from some quality in the contractor which made it negligent for the employer to entrust the work to him.").

[8] Chapter Twelve of the Illinois Vehicle Code identifies the equipment required of each vehicle operating on the state's roads. It is illegal to drive any vehicle that lacks any required part. See 625 ILCS § 5/12-101 ("It is unlawful for any person to drive . . . any vehicle . . . which does not contain those parts . . . as required in this Chapter."). Tail lamps and "adequate mufflers" are two of the parts required by the Code. *Id.* §§ 5/12-201 ("Every motor vehicle, trailer, or semi-trailer shall also exhibit at least 2 lighted lamps, commonly known as tail lamps, which shall be mounted on the left rear and right rear of the vehicle so as to throw a red light visible for at least 500 feet[.]"), 602 ("Every motor vehicle driven or operated upon the highways of this State shall at all times be equipped with an adequate muffler [.]").

caused the accident is that a better contractor would have detected the defects in Bugarin's tractor-trailer and taken it out of service for repairs on the night of the accident. Yet, this hypothetical chain of events relies, without any justification, on one of two assumptions: (1) that an adequate contractor would not have discovered any issues with Bugarin's rig early enough to repair it in time for Bugarin to make his run from Portage, Indiana as scheduled; or (2) if the tractor tailor was not fixed in time, that an adequate contractor would have chosen not to put another rig on the road—one which, had it departed at the same time, might well have been involved in the same accident.

Each of the aforementioned deficiencies in McComb's arguments for causation point to the same conclusion: Plaintiff has failed to establish that Defendant's selection of allegedly incompetent contractors was the proximate cause of the unfortunate events of December 28, 2010. Accordingly, Defendant is entitled to summary judgment as a matter of law, and the court need not explore the other issues presented in this case.

## **CONCLUSION**

For the foregoing reasons, Defendant Central Steel's motion for summary judgment [108] is granted.

ENTER:

Dated: February 26, 2014

REBECCA R. PALLMEYER
United States District Judge

13